**YONKERS CONTRACTING COMPANY, Inc., Plaintiff,**

v.

**MAINE TURNPIKE AUTHORITY, Defendant.**

Civ. A. No. 5–41.

United States District Court
D. Maine.

Oct. 17, 1958.

Brooks Whitehouse, Portland, Me., Stanley J. Norton and Thomas B. Treacy, New York City, Verrill, Dana, Walker, Philbrick & Whitehouse, Portland, Me., for plaintiff.

George D. Varney, Portsmouth, N. H., Edward F. Merrill, Vincent L. McKusick, H. Warren Paine, Hutchinson, Pierce, Atwood & Allen, Portland, Me., for defendant.

DELEHANT, District Judge (retired, serving by assignment).

Ruling is being announced upon a motion by defendant for a summary judgment (Fed.Rules Civ.Proc. rule 56, 28 U.S.C.) in its behalf. It is considered that the state of the pleadings and of the issues made by them ought to be recalled, although this need not be done on this occasion quite as exhaustively and exactly as, in other circumstances, would be imperative.

Jurisdiction is asserted and admitted, and unquestionably exists under Title 28 U.S.C. § 1332(a) (1). The pleadings, antedating the motion under consideration, are the complaint of plaintiff and defendant's answer. No exploratory motions, interrogatories, or requests for admission were served or filed. And no depositions appear to have been taken. Nor, apart from such impact of the instant motion, was any motion served or filed for the purpose of challenging the adequacy of the complaint to state a claim supporting recovery or of the answer to state a defense.

With an effort in the way of abbreviation, and in full awareness of its perils, I shall recall the principal allegations of the complaint, and the chief denials and averments of the answer. The complaint is in six counts. However, the sixth count seems to be merely the incorporated reaverment of certain basic allegations, and of the subjection of plaintiff to the damages, already alleged in counts 2, 3 and 5, with a prayer for the recovery of judgment in the exact amount of the sum of the prayers of those three earlier counts. So, as counsel have done in their briefs, I shall refrain from direct discussion of count 6 and be content to declare that disposition of it follows from the announced determination touching counts 2, 3 and 5. Because certain averments of count 1 are basic to all of the later counts, that earlier count and the answer to it, will be examined in detail considerably greater than that expended upon the other counts. For the claims made in all of the counts arise out of a single contract and the execution of work attributable to it.

## Count I

In paragraph 1, plaintiff alleges that it is a New York corporation authorized to do business in Maine, and that the matter in controversy, exclusive of interest and costs, exceeds the sum of $3,000. This is admitted by the answer.

In paragraph 2 of the complaint, it is alleged that defendant is a citizen of Maine, and a body corporate and politic created by a cited statute of Maine. This, too, the answer admits.

In paragraph 3 of the complaint, plaintiff asserts that on and before March 14, 1954, defendant solicited proposals for the performance of the work of grading and drainage construction along the route of the Maine Turnpike from the Androscoggin river in the city of Lewiston near mile 76 to Maxwell School Road in the Town of Webster near mile 87, together with all work incidental thereto; that pursuant to, and relying upon, the correctness and accuracy of the statements and data contained and referred to in the information furnished plaintiff, namely the provisions of the contract in such paragraph mentioned, *infra*, plaintiff duly submitted to defendant, and defendant duly accepted plaintiff's proposal for the doing of such work, and on or about April 14, 1954 plaintiff and defendant duly made and entered into a written contract, wherein plaintiff, for the considerations therein set forth, agreed to perform such work, which contract is known and designated as Contract No. 209. While no copy of the contract is annexed to the complaint, plaintiff signifies its readiness to make proof of it, and by reference incorporates it into the complaint "including but not limited to, Advertisement for Proposal, the Accepted Proposal, the Contract Agreement, Contract Bond, Specifications and Plans referred to therein * * * and all addenda thereto." Answering in this behalf, defendant admits its solici-

tation of proposals for the execution of the described work, plaintiff's submission to defendant of a proposal to do the work, and the execution of Contract No. 209 on or about April 14, 1954; and it attaches a copy of the entire contract (save only the plans) as an appendix incorporated into the answer. Otherwise, defendant denies all allegations made by plaintiff in paragraph 3 of the complaint. And, evidently to supplement or to emphasize its admission and denial, defendant alleges—perhaps argumentatively—that in making its bid and entering into the contract plaintiff was bound by the specifications and all other parts of the contract, some of which are identified by the numbers of the articles of the contract in which they appear.

In paragraph 4, the complaint alleges that after the execution of the contract, and as soon as directed so to do by defendant, its agents, servants and representatives, plaintiff proceeded in the manner and form and in all respects as provided in the contract to carry out and perform all the terms and conditions of the contract on its part, and did keep and perform all of the terms and conditions of the contract on its part, except such as plaintiff was by direction and requirements of defendant, clearly above and beyond defendant's right under the contract or otherwise, required to perform in manner or ways other than as contemplated and provided by the contract, or except as performance was prevented, hindered or interfered with by direction, requirement, acts or omission of the defendant. The answer categorically denies each and all allegations of that paragraph.

By paragraph 5 of the complaint, provisions numbered 1.63 and 1.69 of the contract are set out verbatim. Copies of these provisions or articles are copied in a footnote.[1] The answer admits the assertion.

---

1. Articles 1.63 and 1.69 of the contract follow:
 "1.63 Measurement of Quantities.

"All work completed and accepted under this Contract shall be measured by the Engineer according to the standards

Plaintiff alleges in paragraph 6 of the complaint that on July 26, 1956 defendant accepted the work; that thereafter the engineer prepared a purported final estimate dated August 6, 1956 and submitted it to plaintiff; that such final estimate was not a true and correct final estimate but was false, untrue and made arbitrarily, in bad faith and under a misconstruction of the terms and conditions of the contract in that it stated the total compensation to which plaintiff was entitled for work performed was $2,720,790.10, and therein failed to certify or authorize for payment to plaintiff the whole amount of work done and quantities computed properly in accordance with paragraph 1.63 of the contract, *supra,* as to the following items:

| | Amount stated in purported final estimate | Correct amount as claimed by plaintiff |
|---|---|---|
| Item 7, Borrow | $1,092,978.96 | $1,123,027.14 |
| Item x31, Blending of porous material | $ 2,820.00 | $ 72,946.07 |

of weights and measures recognized by the National Bureau of Standards, by methods described for each Item of Work in these Specifications, or, in the absence of such description, according to generally accepted standard engineering practice as determined by the Engineer. Measurements of linear dimensions shall be taken horizontally or vertically unless otherwise specified. Areas of cross-sections will be determined by use of the planimeter. Volumes of earthwork will be computed by the average-and-area method, using the length measured along the centerline as the distance between sections. A ton shall be equal to 2,000 pounds avoirdupois. No allowance will be made for surfaces laid over a greater area than indicated on the Plans or otherwise authorized, or for excavation removed or embankment placed beyond the slope lines shown on the cross-sections, except as otherwise specifically noted or authorized by the Engineer in writing."

"1.69 Acceptance and Final Payment.

"Whenever, in the opinion of the Engineer, the Contractor has finally completed all the work under the Contract in a workmanlike manner in accordance with the intent of the Plans and these Specifications, the Authority shall cause a final inspection of the Work to be made and if found satisfactory and so certified, shall accept the Work.

"A final estimate shall then be prepared by the Engineer, as soon thereafter as practicable, authorizing payment in full of monies due under the Contract. The final estimate shall be based on the actual quantities of authorized work done under each item scheduled in the Proposal and under supplemental agreements and Extra Work Orders, if any, at the unit price or prices, lump sum price or prices or on a force account basis, as stipulated therefor. The monies due the Contractor shall be based on the final estimate, deducting therefrom all previous payments on account and liquidated damages, if any.

"Before final payment is made the Contractor shall furnish to the Authority, on the form prescribed, a sworn affidavit to the effect that all bills for salaries or wages due or for material furnished to said Contractor in or about the Project are paid, that no claims in connection with relocation of or disturbance to public or private property, including utilities, remain unpaid, and that no suits are pending. If such affidavit that claims have been paid cannot be given because of a dispute as to the amount or legality of such claim, the Contractor's affidavit shall clearly set out the facts as to the name, address, amount and nature of the dispute; the Authority will then make payment of all of the final amount and percentage due the Contractor, if the Authority is of the opinion that the claim has not been paid for the sole reason that the Contractor, in good faith is questioning the legality of said claim or its amount, and if the Authority is further satisfied that there is good and sufficient bond to fully protect said claimant.

"The acceptance by the Contractor of payment under the said final estimate

Plaintiff alleges that the purported final estimate correctly stated that there had theretofore been paid to plaintiff on account of the contract $2,628,754.36. In connection with the averments last recalled, defendant, by answer, admits its acceptance of the work on July 26, 1956; the engineer's preparation of a final estimate dated August 6, 1956, and submission thereof to plaintiff and to defendant; and its disclosure of $2,720,790.10 as the total amount due for work to plaintiff, of which $2,628,754.36 had been paid on account to plaintiff; attaches an alleged copy of such final estimate as an appendix incorporated into the answer; and, otherwise, denies the allegations of the complaint's paragraph 6.

Next, in paragraph 7 of the complaint, plaintiff alleges that it rejected such final estimate because it was incorrect and improper, as stated in paragraph 6, and also because it was submitted to plaintiff on the express condition that its acceptance would operate as and would be a release to defendant and its agents from all claims in behalf of, or liability to, plaintiff for anything done or furnished for or relating to work under the contract, or for any act or neglect of defendant, or any of its agents or employees, relating to or connected with the contract. In its answer, the defendant denies "each and every allegation contained in paragraph Seventh of the complaint." The breadth of that denial has not eluded me. Yet I am uncertain concerning its intended thrust. It may mean to deny altogether that plaintiff rejected the estimate. Actually that is the only direct allegation of fact in paragraph 7 of the complaint. The rest of it is an argumentative assertion of a justification for the rejection. Or, the denial may be aimed at the reasons assigned for the alleged rejection or some of them. In my doubt, I feel that I must understand the denial to extend to every phase of the seventh paragraph of the complaint, including—and, perhaps I should say, especially—the single alleged fact of the rejection.

In paragraph 8 of the complaint, plaintiff asserts that it has duly demanded the making of a proper final certificate and payment thereunder to plaintiff, but defendant has failed and fails to keep and perform all the terms, covenants and provisions of the contract to be kept and performed by it in that, *inter alia,* defendant or its agents have failed to include in the purported final estimate the true and correct amounts, as hereinbefore recited. The defendant, by answer, both denies each and every allegation of the eighth paragraph of the complaint, and especially denies that the engineer was the agent or servant of defendant in making such final estimate or otherwise in relation to the subject matter of such paragraph 8, and further alleges that defendant had no authority or responsibility with respect to preparing such final estimate; that in its preparation the engineer acted as, and was, an independent agency; and that the amounts whose inclusion in the final estimate is demanded by plaintiff are not the true or correct amounts.

There are no further allegations in the complaint. But, beyond the foregoing admissions and denials, general or qualified, defendant in its answer to plaintiff's count 1, makes these affirmative allegations or contentions:

A. That such count 1 fails to state a claim on which relief can be granted, save and except to the extent of $89,215.74, which is the amount remaining due to plaintiff. (For the manner of its computation, see paragraph D *infra*);

shall operate as and shall be a release to the Authority and its agents from all claims of or liability to the Contractor for anything done or furnished for or relating to the Work under the Contract,

or for any act or neglect of the Authority or any of its agents or employees, relating to or connecting with the Contract."

B. That, by the terms of the contract both plaintiff and defendant agreed upon the firm of Howard, Needles, Tammen and Bergendoff, called the "Engineer," or its authorized representatives, as the independent agency to supervise the performance of the terms and conditions of the contract, to act as arbiter on substantially every question arising in the course of such performance, to make current and final estimates (upon the basis of which partial and final payments were to be and have been made by defendant to plaintiff), and to determine the quality and acceptability of construction materials to be used and construction methods to be followed in many specific instances and respects; that such Engineer was not the servant or agent of defendant in the performance of any such duties. For specific delineation of the Engineer's authority, defendant cites and in part quotes from Article 1.30 of the contract, of the quoted part of which a copy is set forth in a footnote.[2] It finally cites, without quotation, several other numbered articles of the contract;

C. That, except as set out in the next ensuing paragraph, the Engineer, in making such final estimate, acted in accordance with the contract, especially Article 1.69 thereof; that the final estimate was not false or untrue, was not made arbitrarily, or in bad faith, or under any misconstruction of the terms and conditions of the contract, and that in making it the Engineer acted reasonably and in good faith; that under the contract, especially Article 1.69 thereof, the moneys due plaintiff are to be based on the final estimate prepared by the Engineer, deducting therefrom all previous payments on account and liquidated damages, if any; that the final estimate is consequently binding and conclusive on plaintiff, as prepared by the Engineer;

D. That plaintiff is not entitled to extra payment in any amount for "Item x31, Blending of Coarse Material" in the final estimate; that the allocation in the final estimate of the sum of $2,820 to that item is erroneous and unauthorized by the contract, in that to whatever extent such work is embraced in one of the items of work listed in the "Schedule of Prices" of the contract, such work, pursuant to the contract, is to be paid for at unit prices; and if it be not embraced in such list of items of work but is "extra work" the provisions of the contract touching extra work, notably Articles 1.64, 1.65 and 1.66 have not been complied with so as to impose any obligation therefor to plaintiff upon defendant. Citing Article 1.37, the answer then declares that the contract provided that any extra work done without a prior written order by the Engineer approved in writing by the defendant itself would not be paid for, and that defendant has never approved such work. And upon the basis of the deduction from the amount due plaintiff of such sum of $2,820, defendant computes the total amount due plaintiff under count 1 to be $89,215.74, which it signifies its readiness and willingness to pay, however only "when plaintiff shall furnish to the Defendant Authority the sworn affidavit and shall do the other things required by

2. The quoted part of Article 1.30 of the agreement follows:

"1.30 Authority of Engineer—Arbitration.

"The work shall be done under the supervision of the Engineer to the fulfillment of the Contract requirements. The Engineer shall decide any and all questions which may arise as to the quality or acceptability of materials furnished and work performed, and as to the manner of performance and rate of progress of the work. He shall decide all questions which may arise as to the interpretation of the Plans and Specifications, and all questions as to the satisfactory and acceptable fulfillment of the terms of the Contract on the part of the Contractor. The Engineer shall determine the amount and quantity of the several kinds of work performed and materials furnished under the Contract and his decision shall be final. The Engineer is not authorized to increase the obligation of the Authority to the Contractor, except as specifically set forth in the Specifications."

Article 1.69 of said contract as conditions precedent to its right to final payment." Reverting now to the complaint, the prayer of its Count 1 is for judgment

against defendant for $192,209.99 with interest thereon. The foregoing amount is obviously the sum, by way of addition, of,

| | | |
|---|---|---|
| (a) | difference between gross amount shown by final estimate to be payable to plaintiff and amount already paid to it. | $ 92,035.74 |
| (b) | difference between final estimate's figure for "Item 7, Borrow" and correct amount as claimed by plaintiff. | 30,048.18 |
| (c) | difference between final estimate's figure for "Item x31, Blending of porous material" and correct amount as claimed by plaintiff. | 70,126.07 |
| | Total | $192,209.99 |

Defendant prays alternatively that plaintiff have no recovery on the first count, or that if it shall first have performed the alleged contractual conditions precedent to its final payment, it be awarded judgment for $89,215.74, but that defendant recover its costs. The figure last given is clearly the foregoing sum of $92,035.74 less the Engineer's final estimate's allegedly erroneously allowed amount on account of "Item x31, Blending of porous materials" $2,820. It is a matter of simple subtraction.

Counts 2, 3, 4 and 5 (Common Issues)

The four counts thus identified are to be understood as having two features in common. The first is that each such count arises out of the work and contract which are the subject matter of Count 1, and has to do with a specific claim for recovery so arising. The second feature common to all of them is that in the statement of plaintiff's claim in each of the four counts plaintiff, by reference, and without factual repetition, incorporates its allegations made in paragraphs 1, 2, 3 and 4 of Count 1, supra, and defendant, answering, also by reference and without factual repetition, reiterates its positions taken in relation to those several allegations in its answer

to Count 1. Those points may be understood hereafter without restatement in relation to the separate counts involved.

Count 2

Plaintiff, in paragraph 10 of its complaint, asserts that, before the submission of its proposal, it duly examined the contract and all documents and information made available to it, made all other required investigations, and considered all matters relating to or affecting the work as contemplated or provided by the contract. Defendant, in answer, disclaims knowledge or information adequate to support a belief as to the truth of such allegations, and is, therefore, considered to deny them. It also asserts that they are irrelevant and immaterial and asks that they be stricken.

In paragraph 11 of the complaint, plaintiff alleges that, before the award to it of the contract, defendant was satisfied that plaintiff had the facilities, experience, ability and financial resources requisite for the execution of the work within the prescribed time, and to defendant's satisfaction. This assertion is wholly denied by the answer, which again

challenges its relevancy and materiality, and prays that it be stricken.

By paragraph 12 of the complaint, plaintiff alleges the contract's inclusion of certain language in its Articles numbered 7.1, 7.2, 2.7, and 1.46 of which a copy is set out in a footnote.[3] The allegation is admitted in the answer.

Paragraph 13 of the complaint asserts that the contract required plaintiff to complete performance of the work on or before December 1, 1954, and provided for the imposition upon it of penalties in the event of its failure in that behalf; that, in consequence, plaintiff prepared its bid on the basis of the completion of the work by that date; that, in accordance with the requirements of the contract, and on the undertaking of defendant that it would timely furnish borrow pits and rights of way, plaintiff submitted its progress schedule, showing the time and sequence of the performance and completion of the several portions of the work, and its entire completion by December 1, 1954. Answering that paragraph, defendant admits the contract's inclusion of language providing that plaintiff should "complete the performance of all work on or before December 1, 1954" but denies the averment that such provision was coupled "with penalties being imposed upon plaintiff in the event of its failure so to timely complete." And in connection with the thirteenth paragraph of the complaint, and its entire second count, defendant alleges that:

(A) While the contract, notably Articles 1.59 and 2.3 of it, did contain provisions for liquidated damages, such damages were made payable only if plaintiff failed fully to perform its obligations within the time stated in the contract or within such further time as should be granted; that the contract in cited sections provided for the granting to plaintiff in certain contingencies of extension of time for completion; that such extensions were granted from time to time; and defendant has not asserted,

---

3. The language thus quoted from the contract is this:

"7.1 Description

"Borrow shall include the excavating, from borrow pits furnished by the Authority outside the right-of-way, together with the hauling, placing and compacting thereof as provided elsewhere in these Specifications, of all materials which are not available from other excavation sources and which are required for embankments and formation of roadbed in cuts, including materials for Porous Fill, Select Subbase and Gravel Base.

"Overhaul shall consist of transporting specified material from a borrow pit for a distance in excess of two miles, by way of the shortest practicable truck route to the Turnpike right of way and/or for a distance in excess of three miles along the Turnpike right of way from the point of entry.

"7.2 Materials.

"Materials in Borrow pits will be provided by the Authority at no cost to the Contractor.

"The suitability of materials from borrow with respect to classification for various purposes will be determined by the Engineer in accordance with Article 4X.2 hereof and the Contractor shall make use of these various materials in accordance with the directions of the Engineer."

"2.7 Right of Way.

"The Authority will secure the right of way necessary for the permanent construction under this Contract. The exact status of the acquisition of the areas of real property required for the Turnpike within the Contract limits may be obtained at the offices of the Maine Turnpike Authority, 17 Bishop Street, Portland, Maine."

"1.46 Public Utilities and Railroad Structures.

" * * * Where public utilities railroad structures, or their appurtenances interfere with the permanent construction of the Project, the work involved in relocating or otherwise altering such public utilities, railroad structures or their appurtenances will not be a part of the Contract except where required by the Plans or provided for elsewhere herein. Any relocation or rearrangement of these facilities made for the Contractor's sole convenience shall be paid for by the Contractor."

and does not assert, any claim for liquidated damages against plaintiff;

(B) That defendant is without knowledge or information sufficient to form a belief as to the truth of the allegation that plaintiff prepared a bid on the basis of completing its work on or before December 1, 1954; but that if it did, it acted in that behalf at its own risk, because the contract, especially its Article 1.58 provided that if, for any reason beyond plaintiff's control the project were delayed (other than on suspension of work under written direction of defendant or the engineer, neither of which gave such direction) plaintiff should have no right, and should make no claim, to damages or additional compensation by reason of the delay;

(C) That defendant is without knowledge or information sufficient to form a belief as to the truth of the allegation that plaintiff submitted a progress schedule, *supra*; but that such allegation is irrelevant and immaterial and defendant demands that it be stricken;

(D) That defendant denies all other allegations of paragraph 13 of the complaint.

In paragraph 14 of the complaint, plaintiff asserts that, to enable plaintiff to make timely compliance with its contract, it was essential that defendant promptly supply plaintiff with borrow pits and furnish it with the rights of way necessary for the permanent construction; that defendant was legally obliged so to do, and was bound to that effect by Articles 7.1, 7.2, 2.7 and 1.46 of the contract, to the end that plaintiff might properly proceed with its work and complete it by December 1, 1954. Defendant denies these allegations.

In paragraph 15 of the complaint, it is declared that, notwithstanding its duty in the premises, and plaintiff's demands, defendant, its agents, servants and representatives wrongfully failed and refused to give plaintiff timely possession of borrow pits and rights of way, and thereby actively interfered with and prevented plaintiff from proceeding, in a normal, orderly, efficient and reasonable manner and sequence, to execute and complete the contract; that in consequence thereof, plaintiff was unable to utilize its equipment in a reasonable and efficient manner, or to progress its operations, was required to alter and modify its method and plan of operation, and was required to execute the work at times and in a manner much more costly than would have been the case if defendant had made available such borrow pits and rights of way; that for like reasons, plaintiff was compelled to, and did, incur large additional expenses which it would not otherwise have incurred in excavating and handling frozen ground, in necessarily shutting down much of its operations during the ensuing months when no contract operations were practicably possible, with resultant loss and expense of the rental value and use of equipment, with resultant obligation to pay substantial increases in wages and other benefits, beyond those to which it would otherwise have been subjected, and also with resultant charges and payment for otherwise unnecessary field, administrative, and other expenses; and that defendant also unreasonably, and in violation of plaintiff's rights, required plaintiff to speed up its work and substantially to complete it by October, 1955, in consequence of which plaintiff was required to work for long periods of overtime at non-productive premium wage costs. All of those allegations are denied by defendant.

Finally, by paragraph 16 of its complaint, plaintiff alleges its damage in consequence of the matters set out in Count 2, in the sum of $611,259.11, for which together with interest it prays judgment. The allegation of damage is denied by defendant.

Beyond its denials and admissions already noted, defendant further asserts touching the averments of Count 2.

(E) That Count 2 fails to state a claim against defendant for which relief can be granted;

(F) That defendant performed all the terms and conditions of the contract on its part to be performed, including the provision and furnishing of borrow pits to plaintiff, and securing necessary rights of way for permanent construction under the contract, and gave plaintiff possession of such borrow pits and rights of way in accordance with the contract, which were in fact accepted and used by plaintiff and formed the basis upon which partial payments have been made to and accepted by plaintiff, and the final estimate was made;

(G) That in the area for the performance of the work, the period between the making of the contract and December 1, 1954, was one of unusually excessive and heavy rainfall, as a result of which on many days therein plaintiff did not work its men or equipment on said work; and the plaintiff encountered greater difficulty in operating its machinery and in working upon the materials than would have been the case under normal weather conditions, and its work under the contract proceeded more slowly than had been anticipated; that such rainfall and plaintiff's failure to prosecute the work under the contract with skill, diligence and dispatch were the direct causes of plaintiff's failure to complete the work prior to December 1, 1954;

(H) That the contract was one for the performance of certain units of work at fixed unit prices expressly, by the terms of the contract, notably Article 1.67 thereof, made the only compensation to which plaintiff was entitled for performing work contemplated and embraced under the contract, and for all loss by damage to or destruction of the project for any cause or unforeseen difficulties which might be encountered in the work, until its final acceptance by the defendant, and for all risks of every description in connection with the prose-cution of the work and for all expenses incurred because of suspension or discontinuance of work; that plaintiff was never informed by defendant before or at the time of entering into the contract that defendant had acquired or had available any particular borrow pits; that the contract, notably Article 2.7 thereof, provided that plaintiff might obtain information at the offices of defendant touching the exact status in the area of real property required for the project within the contract limits, including such rights of way; that the contract as written contemplated possible delays in acquisition of suitable borrow pits and rights of way, and made provision for extensions of time during which plaintiff would not be subject to liability for liquidated damages, particularly in Article 1.58, that if, for any reasons beyond plaintiff's control, the project should be delayed (other than on suspension of work under written direction by defendant or the engineer, neither of which has given any such direction), plaintiff should have no right nor make any claim for damages or additional compensation by reason of the delay, but might be granted an extension of time by defendant, as provided in Article 1.61 of the contract, and that Article 1.58 of the contract is a complete bar to plaintiff's claim for damages occasioned by the alleged delay in the acquisition of borrow pits and rights of way.

(I) Defendant by its answer further denies that it either unreasonably or in violation of plaintiff's right, required plaintiff to speed up its work and substantially to complete it by October, 1955, or required plaintiff so to do in any way, and further alleges that if plaintiff were so required to speed up its work at that time, such requirement was made by the Engineer in whose exclusive control and direction such matters were placed by agreement of the parties in the contract, citing Articles 1.21, 1.54 and 2.2 thereof. Finally, defendant reiterates the allegations made by it in paragraph B in relation to Count 1, supra.

And defendant prays for the dismissal of Count 2 of the complaint.

## Count 3

In the complaint's paragraph 18, plaintiff alleges that in the performance of its work under the contract, it was required to construct embankments which involved the placing and compacting at prescribed locations of materials suitable for the purpose obtained from excavations and borrow pits. This, the defendant by answer neither admits nor denies, but for its position respecting it, refers to the entire contract.

By paragraph 19 of the complaint, it is alleged that the contract provided that the suitability of materials for placing and compacting in embankments was to be determined by the engineer at the time of excavation, and that materials excavated that were unsuitable for embankment construction should be disposed of by plaintiff beyond the limits of the right of way. To this allegation, defendant in its answer makes like response as was made to paragraph 18, supra.

By paragraph 20, plaintiff alleges that while it was proceeding in good faith with its work, and in the course of excavating materials in cut sections, it encountered from time to time materials unsuitable for placing and compacting in embankments, and brought such fact to the engineer's attention, but that the engineer arbitrarily, wrongfully, in bad faith, and in misconstruction of the contract, directed plaintiff over its protest, to attempt to utilize such unsuitable materials and not to waste the same, to add borrow to unsuitable material and work the same so that the mixture would result in an eventual compactible mass, and to procure and place borrow in a manner different from that contemplated by the contract in that plaintiff was required to haul borrow over unsuitable material; that said directions of defendant were violative of plaintiff's contractual rights, and were in effect through the summer construction season of 1954 until September 10, 1954, when defendant permitted plaintiff to waste the unsuitable material which it was encountering in its excavation work. Defendant denies every allegation contained in that particular paragraph, and particularly denies its own giving of the alleged directions and requirements.

Paragraph 21 of the complaint alleges that in wrongfully refusing to permit waste of unsuitable materials encountered in excavating, and in withholding permission therefor until September 10, 1954, defendant required plaintiff to excavate and waste unsuitable material at a time of year and under conditions more difficult and expensive than would have been the case if plaintiff had been permitted to waste such material during the construction season of 1954. The allegations of this paragraph are wholly denied by defendant.

The complaint's paragraph 22 alleges that in being wrongfully required by defendant to manipulate unsuitable material by incorporating therein suitable borrow material in an attempt to obtain acceptable compaction, plaintiff was put to the cost and expense of obtaining the borrow material, hauling it long distances over material which was of a nature difficult to haul over, and performing work, service, and the furnishing of equipment beyond that required under the contract. The allegations of this paragraph are also denied by defendant.

In paragraph 23 of the complaint, it is alleged that because of being prevented from wasting unsuitable material when it was encountered, plaintiff was required to procure and place borrow in a manner different from that contemplated by the contract in that it was required to haul borrow over unsuitable material and lost the opportunity of placing the borrow material over compact fills made progressively as borrow material was placed; that the hauling of borrow material over areas of unsuitable material seriously reduced the productivity and

efficiency of plaintiff's equipment and its operation, and increased the cost of performance of the work over the contractually contemplated cost. The allegations of this paragraph are denied by defendant.

Then, successively by paragraphs 24, 25 and 26, plaintiff alleges that its damages arising under paragraph 20, insofar as it deals with the attempt to utilize unsuitable material and refusal to allow wasting, were $201,161.98; that its damages by reason of the matters set forth in paragraph 20, in connection with the addition of borrow to unsuitable material, and the working of the same, and paragraph 22 amounted to $85,103.75; and that its damages on account of the matters set out in paragraph 20 dealing with the procurement and placement of borrow in a manner different from that contemplated by the contract through the hauling of borrow over unsuitable material, and paragraph 23, was the sum

of $284,929.29. All those allegations of damages are by the answer denied.

In addition to its admissions and denials touching Count 3, defendant makes the following further allegations as against that Count:

(J) That Count 3 fails to state a claim against defendant on which relief can be granted;

(K) That the allegations of paragraph (B) of the answer to the First Count, supra, apply alike to the Third Count; that the parties to the contract, by it, committed to the engineer as an independent agency the authority and responsibility, among other things, of determining the suitability of materials in connection with the specifications; that with direct reference to the subject matter of Count 3 of the complaint, the contract contained certain provisions in its Articles 4.3D, 4.3F and 4.X2, of which copies are set out in a footnote.[4]

---

4. The cited contractual sections are:

"4.3D Unsuitable Material. When soft, mucky, spongy or other materials which, in the opinion of the Engineer, are unsuitable for foundation of the roadbed or embankment or for the stability of slopes and ditches, are encountered (a) below the neat section lines (template grade, ditches and slopes) in cut sections and (b) in embankment foundation areas, such material shall be removed within the lateral limits and to the depths specified by the Engineer.

"Such unsuitable materials excavated by the order of and within the lateral limits and to the depths specified by the Engineer, will be measured and paid for as Earth Excavation; any material rendered unsuitable by the Contractor and any material removed in excess of approved limits and depths will not be included in the volume for payment and the Contractor will be required to provide at his own expense the material, properly compacted, necessary to replace the excess material which has been excavated. Unsuitable materials shall be disposed of as specified below. After the removal of unsuitable materials, the areas so excavated shall be built up or backfilled to the required neat section lines in cut areas and to the original ground line in embankment areas with acceptable

material, properly compacted as hereinafter provided."

"4.3F. Disposal of Materials. Materials removed by excavation and suitable for backfill or embankment shall be used in the formation of common embankment, Select Subbase and Gravel Base, as directed by the Engineer. Suitable materials shall not be wasted except with the written approval or at the written instruction of the Engineer. It shall be the Contractor's responsibility to perform excavation in such manner that gravel or other materials required for embankment, Select Subbase or Gravel Base will be available when required and no additional compensation will be allowed for any special sequence of excavation or placement of such material. When any specific suitable material required for embankment, Select Subbase and Gravel Base is available from excavation but is not reserved for such use by the Contractor, suitable material in equivalent quantity necessary to replace such material not reserved as herein required shall be furnished by the Contractor at his own expense.

"Excavated materials which are unsuitable for embankment construction shall be disposed of by the Contractor beyond the limits of the right-of-way. Unless otherwise shown on the Plans or provid-

(L) That the engineer, in giving any directions to plaintiff as alleged in Count 3, acted reasonably, lawfully, in good faith, and in accordance with the terms and conditions of the contract.

(M) That if the engineer did direct plaintiff to do the things alleged in Count 3, and therein acted arbitrarily, wrongfully, in bad faith, and in misconstruction of the contract (all of which is denied), the contract, notably Article 1.30, expressly provided that the engineer was not authorized to increase the obligation of the defendant to the plaintiff, and any such action by the engineer would not be a breach of contract by defendant.

(N) That the contract was one for the performance of particular items of work at fixed unit prices, and for extra work upon certain terms and conditions, that by Article 1.3 of said contract, it was provided in part that

"*Extra Work:* Any work required by the Engineer which in his judg-

ment is in addition to that required by the Plans and Specifications when the Contract was awarded and differs in character from the items of Work contained in the Schedule of Prices of the Proposal."

that the work alleged by plaintiff in Count 3 to have been required of it is included within Item 7 Borrow, Item 4(a) Excavation-Earth, and other items of the Schedule of Prices, for which by the contract plaintiff was to be paid fixed unit prices and no more; and that plaintiff has been accorded full credit at the agreed unit prices by the engineer's final estimate for all work alleged by plaintiff to have been done under Count 3; that to the extent, if any, that any such work was not to be paid for at such unit prices, it constituted extra work under the contract, and plaintiff has failed to comply with the provisions of the contract relating to extra work, particularly Articles 1.64, 1.65 and 1.66 thereof, copies of which are set out in a footnote.[5]

ed for in Section 2, the Contractor shall provide all areas for the disposal of waste material at his own expense and all costs related thereto shall be included in the appropriate prices bid for Excavation in the Proposal. The Engineer shall be advised of the locations of all areas to be used for disposal of waste and unsuitable materials, other than those provided by the Authority, the disposal methods to be employed and the treatment to be given to material to be deposited in disposal areas. Material to be wasted shall not be deposited within the limits of the right-of-way except with the specific approval of the Engineer."

"4X.2. The suitability of materials with respect to classification, stability and compactibility will be determined by the Engineer. To the extent that materials are required for embankment, they shall be obtained from excavation for roadways, foundations, drainage structures and waterways. Where more materials are needed, they shall be obtained from borrow pits. Any such materials wasted, or otherwise disposed of by the Contractor, shall be replaced by him at his own expense with other suitable materials."

5. Sections 1.64, 1.65 and 1.66 follow:
 "1.64 Extra Work

"Subject to the provisions of Article 1.30 entitled 'Authority of Engineer', the Engineer shall have the power, not only to alter the Plans and Specifications and to vary, increase and diminish the character, quantity and quality of, or to countermand, any Work now or hereafter required but also to require the performance of Extra Work. Extra Work shall be performed in accordance with the Plans therefor and these Specifications and any amendments or additions thereto for such Extra Work. Payment for Extra Work shall be made as provided in Article 1.65 hereof entitled 'Extra Work Orders.'

"1.65 Extra Work Orders.

"When Extra Work is ordered, the Engineer will issue an order in writing, herein termed an 'Extra Work Order'. for such Work and the Contractor shall accept, at the discretion of the Authority, in full payment therefor a compensation determined either on an agreed unit price or lump sum basis, or on a force account basis, as follows:

"(a) If the Authority so elects, unit prices or a lump sum shall be determined and mutually agreed upon in writing by the Contractor and the Engineer before such Extra Work is commenced.

That no written order was ever given by the engineer to plaintiff clearly indicating the engineer's intention to treat as extra work the work alleged in the third count, and no such work order was ever submitted to defendant for its approval, or approved by it; that plaintiff did not within 48 hours after being directed or required to do any such work, nor at any time, give written notice to defendant and the engineer stating that plaintiff deemed the work in question to be extra work, and why it deemed it to be such, or furnish the engineer time slips and memoranda as required by Article 1.65; that such failure of plaintiff to serve such notice or time slips or memoranda is agreed by the contract to be a conclusive and binding determination on plaintiff's part that the engineer's directions in the premises did not require the performance of extra work, and to constitute a waiver by plaintiff of all claims for additional compensation or damage therefor.

For the matters set out in the complaint's Count 3, plaintiff prays judgment against defendant in the aggregate for $571,195.02 with interest thereon; liability for which defendant entirely denies.

### Count 4

It is alleged in paragraph 28 that the contract, among other things, included the following language:

"Specifications: The general term comprising all the directions, provisions, and requirements contained herein entitled 'Specifications', supplemented by such Plans and Supplemental Agreements as may be necessary, together with all docu-

ments of any description pertaining to the method and manner of performing the Work or to the quantities and qualities of materials to be furnished under the Contract.

\* \* \* \* \* \*

"Second. The Contractor for and in consideration of certain payments to be made as hereafter specified, hereby covenants and agrees to perform and execute all of the provisions of this Contract and of all documents and parts attached hereto and made a part thereof, and at his own cost and expense to furnish and do everything necessary and required to construct and complete ready for its intended purpose, in accordance with the Contract and such instructions as the Engineer may give, acceptable to the Consulting Engineers and the Authority, in the times provided, all of the work covered and included under Contract No. 209 covering Grading and Drainage as herein described, for the Augusta Extension of the Maine Turnpike.

\* \* \* \* \* \*

"Plans. All official approved drawings, or reproductions of such drawings, showing the details of the Work to be performed under the Contract in connection with the construction of the Project.

\* \* \* \* \* \*

"1.24. Plans, Specifications and Work to Be Performed.

"These Specifications, the Plans and all other contract documents are essential parts of the Contract, and a

"(b) If agreement on unit prices or a lump sum basis cannot be made, or if the Authority so elects, compensation for such Extra Work will be determined by the Engineer on a force account basis as follows:
"1.66. Claims for Compensation for Extra Work.
"No Extra Work shall be performed except pursuant to the written orders

of the Engineer, expressly and unmistakably indicating its intention to treat the Work described therein as Extra Work. All Extra Work Orders will be approved by the Authority, and no Extra Work shall be performed pursuant to such an order unless the approval of the Authority is indicated on the place provided therefor on the Extra Work Order."

requirement appearing in one is as binding as though appearing in all.

"The intent of the Plans and Specifications is to prescribe a complete Project which the Contractor undertakes to perform, in full compliance with the Plans, the Specifications, Proposal and other contract documents. The Plans and Specifications are intended to complement and supplement each other. Should any work be required, which is not denoted on the Plans or in the Specifications because of an omission, but which is nevertheless necessary for the proper performance and completion of the Project, such work shall be performed as fully as if it were described and delineated. Should any misunderstanding arise as to the intent or meaning of said Plans and Specifications, or any discrepancy appear in either, the decision of the Authority in such cases shall be final and conclusive."

This allegation is admitted by the answer.

In the 29th paragraph of the complaint, it is alleged that included in the Plans forming part of the contract were sheets 25, 26 and 27, each entitled "Mass Diagram" upon which were shown the volume of excavation, the quantities of required additional fill from borrow, and the quantities of stripping; that the purpose of furnishing such Mass Diagrams was to inform plaintiff of the locations and quantities of the excavations and fills, and to indicate the movement of excavated material from points of excavation to point of fill, so that in preparation of its proposal, plaintiff could prepare its estimate of the quantities of material to be moved, the distance of movement, and the locations between which such movements were to occur; that said Mass Diagrams disclosed that there was a deficiency in the quantity of excavated material for embankment, and plaintiff would be required to make up such deficiency from material obtained from borrow pits to be supplied by defendant, and also that there was no quantity of material to be wasted of sufficient importance to plaintiff in preparing its proposal to be noted on such Mass Diagrams, with the exception of about 170,000 cubic yards of material to be stripped; that in order to submit its proposal plaintiff had necessarily to rely upon the accuracy of the representations, statements and conditions shown on such Mass Diagrams, and particularly those hereinbefore mentioned; that said Mass Diagrams constituted a warranty by defendant that plaintiff's work would not involve any substantial amount of unsuitable material to be wasted, and a statement of the existence of a condition, and formed a part of the consideration under which the parties entered into the contract. Touching the allegations of paragraph 29 of the complaint, defendant by answer admits that sheets 25, 26 and 27, each entitled "Mass Diagram" were included in the Plans forming a part of the contract, but alleges that upon such sheets were shown only an estimate of the volume of the excavation and the quantity of the required additional fill from borrow, and that any indication on any such Mass Diagram as to the quantity of material to be wasted was only an estimate of the amount of such material which might be wasted, and the defendant denies all other allegations of the paragraph, emphasizing its denial that such Mass Diagrams constituted any warranty.

By paragraph 30 of its complaint, plaintiff alleges that it began the performance of its work, and shortly thereafter encountered quantities of unsuitable material for placing and compacting in embankments, and throughout the performance of its excavation work continued to encounter vast quantities of unsuitable material, aggregating more than 900,000 cubic yards, of which about 672,000 was subsequently wasted. All of this paragraph is denied by defendant.

Paragraph 31 of the complaint alleges that plaintiff encountered such unsuitable material in cut sections as it was proceeding with its excavation; that it brought this fact to the attention of the engineer, but the engineer arbitrarily, wrongfully, in bad faith, and in misconstruction of the contract, directed plaintiff to place such unsuitable material in embankments, and to work over and attempt to induce into such material characteristics which would enable such material to be compacted, which plaintiff under protest attempted to do; that plaintiff was unable to obtain acceptable compaction except in those instances where it was required over and against its protest to defendant to add other materials to the unsuitable material, and to work and manipulate the same to the end that the mixture was such as could be compacted after expenditure of an unreasonable amount of effort, and the use of means not contemplated by the contract, and over a long period of time; that on September 10, 1954, plaintiff was directed by defendant to, and thereafter did, waste said unsuitable material and go back to areas where it had previously placed unsuitable material, and unsuccessfully attempted to obtain acceptable compaction where it had excavated said unsuitable material pursuant to defendant's direction, and wasted it, and replaced it by suitable material from borrow; that the effect of the matters set forth in such 31st paragraph was to put plaintiff to the cost and expense of wasting unsuitable material, of obtaining borrow material, hauling it long distances over material difficult to haul over, and performing work and services, and furnishing equipment, beyond the requirements of the contract. Defendant by answer denies every allegation in paragraph 31, and specifically declares that none of such requirements of plaintiff were ever made by defendant, and that the final estimate gave plaintiff full credit at the contractually specified unit prices for wasting material, and obtaining additional borrow material alleged by him in that paragraph.

By paragraph 32 of the complaint, plaintiff alleges that the existence of vast quantities of unsuitable material referred to in paragraph 31 constituted a breach of the warranty referred to in paragraph 29 and was a misrepresentation, and constituted a condition directly opposed to the condition covenanted by defendant to exist as a part of the consideration upon which the parties contracted; that the existence of said quantities of unsuitable material, and the work, labor and service furnished by plaintiff at the direction of defendant and over plaintiff's protest, in connection with the handling thereof, and the effect on the work of plaintiff, constituted a vital change in the nature of the work contracted for, and brought about a change in the identity of the subject matter of the contract. All of the allegations of this paragraph are denied by the defendant in the answer, which also asserts that the matters referred to therein constituted extra work to the extent, if at all, they occurred.

It is alleged in paragraph 33 of the complaint that by reason of the matters set out in Count 4, plaintiff sustained damages in the sum of $557,115.28. This defendant wholly denies.

With further reference to the fourth count of the complaint, defendant makes the following assertions:

(O) That such count fails to state a claim upon defendant upon which relief can be granted;

(P) That under the contract any estimate of quantities shown on such "Mass Diagrams" was in no way warranted to indicate the true quantities or distribution of quantities, and plaintiff agreed that it would make no claims against defendant if the actual quantity or quantities did not conform to the estimated quantity or quantities, and further provided that if upon completion of construction, the actual quantities should

either increase or decrease from the quantities given in the proposal, the unit prices bid in the proposal should still prevail; that the contract specifically provided that the quantities listed in the proposal, which were those shown in the "Mass Diagrams", were to be considered as approximate and were to be used solely for comparison of bids. At this point, the answer cites Articles 1.5, 1.7 and 2.5 of the contract; that said "Mass Diagrams" did not constitute any warranty by defendant; that the work to be performed by plaintiff did not involve any substantial amount of unsuitable material to be wasted, or constitute a statement of the existence of a condition forming a part of the consideration on which the contract was entered into; and that the contract expressly negatived the existence of any alleged warranty, statement or representation;

(Q) That paragraphs (B) and (K) of defendant's answer to the First Count were repeated and reaverred, and the effect thereof argued;

(R) That the subject of the increase of quantities or work under the contract was expressly provided for and treated by the contract, particularly Article 1.25 thereof in the following language:

"1.25 Increased or Decreased Quantities.

"The Authority reserves the right to make alterations in the Plans or in the quantities of work as may be necessary, either before or after the beginning of work under the Contract, to insure completion of the Project in accordance with decisions reached by the Authority. Such alterations shall not be considered as a waiver of any conditions of the Contract nor invalidate any of the provisions thereof, provided such alterations do not decrease or increase the Total Amount of the Contract more than twenty-five per cent. When alterations are made in excess of that herein specified, then either party to the Contract, upon written demand, shall be entitled to a revised Contract consideration, to be fixed and agreed upon in a written supplemental agreement covering the excess quantities involved in the necessary changes. The Supplemental Agreement shall be executed between the contracting parties and the Contract Bond shall be adjusted to include such Supplemental Agreement.

"In the event the Engineer and the Contractor are unable to arrive at an agreement, the matter shall be settled by arbitration in accordance with the provisions of Article 1.30.

"Conditioned upon the provisions of the first paragraph of this Article, the Authority may omit any Item or Items in the Contract, provided that notice of intent to omit such Item or Items is given to the Contractor before any material has been purchased or labor involved has been performed, and such omission shall not constitute grounds for any claim for damages or loss of anticipated profits. The Authority may omit any item or items shown in the Schedule, at any time, by agreeing to compensate the Contractor for the reasonable expense already incurred and to take over at actual cost to the Contractor any unused material purchased and paid for by him in good faith for use for the Item or Items omitted."

That any alterations made in the quantities of work under the contract did not increase the total amount of the contract more than twenty-five per cent, and that under the contract plaintiff is entitled to be paid, and has in fact been credited with, the unit prices for such additional quantities, and that plaintiff is entitled only to such unit prices.

(S) That, if as claimed by plaintiff in paragraph 32 and elsewhere in the fourth count of the complaint, the alleged existence of vast quantities of un-

suitable material constituted a change in the nature of the work, such different work was extra work, and governed by the provisions of the contract upon that subject.

Concluding the fourth count, plaintiff prays under it for judgment against defendant in the sum of $557,115.28 with interest, its right to which defendant wholly denies.

## Count 5

In paragraph 35 of the complaint, plaintiff alleges that the contract included the following language:

"7.1 Description.

"Borrow shall include the excavating, from borrow pits furnished by the Authority outside the right-of-way, together with the hauling, placing and compacting thereof as provided elsewhere in these Specifications, of all materials which are not available from other excavation sources and which are required for embankments and formation of roadbed in cuts, including materials for Porous Fill, Select Subbase and Gravel Base.

"Overhaul shall consist of transporting specified material from a borrow pit for a distance in excess of two miles, by way of the shortest practicable truck route to the Turnpike right of way and/or for a distance in excess of three miles along the Turnpike right of way from the point of entry.

"7.2 Materials.

"Materials in Borrow pits will be provided by the Authority at no cost to the Contractor.

"The suitability of materials from borrow with respect to classification for various purposes will be determined by the Engineer in accordance with Article 4X.2 hereof and the Contractor shall make use of these various materials in accordance with the directions of the Engineer."

This allegation defendant admits.

In paragraph 36, plaintiff alleges that defendant was obligated under the contract to furnish plaintiff with the required borrow pits at such times and locations as would enable plaintiff to perform its work in an ordinary, reasonable and normal manner, and that such furnishing of borrow pits was a necessary condition precedent to the performance of the work. This defendant wholly denies.

By paragraph 37 of the complaint, it is alleged that pursuant to its obligation to furnish borrow pits, defendant furnished plaintiff with a map of the project, falsely representing to plaintiff the availability of sixteen borrow pits, at convenient and stated locations on the Plan, whose numbers are set out in the paragraph, all of which required little or no clearing; that said representation was false; that plaintiff relied upon its accuracy and was misled, and that said representation was made by defendant to induce plaintiff to submit its proposal. All this defendant denies.

By paragraph 38 of the complaint, it is alleged that, relying on the representation so made, plaintiff visited the site prior to the bid, examined the borrow pits, and requested of defendant on or about May 12, 1954 that it provide borrow pits represented on the map to be available, and numbered 4005, 4023, 4300, 4313, 4331, 4400, 4410 and 4462, none of which required appreciable clearing; that defendant did not make available said above mentioned borrow pits, but on the contrary supplied only three pits, none of which were among those by it represented to be available, or those requested by plaintiff, and all of which required substantial clearing. All of this, too, the defendant denies.

By the 39th paragraph of the complaint, it is alleged that in consequence of the wrongful failure and refusal to furnish borrow pits, plaintiff was required to clear borrow pits at substantial expense, and to haul borrow material from borrow pits at inconvenient loca-

tions and great distances, with the result that the average station haul of borrow was increased from 72 stations, as determined by plaintiff from an examination of the map of the project, to 82.3 stations, thereby causing plaintiff additional costs, loss, damage and expense in the amount of $112,734.30 for additional haul, and $15,554.06 for clearing.

In addition to its denials and admissions, supra, defendant by its answer further alleges concerning Count 5:

(T) That the count fails to state a claim against defendant upon which relief can be granted.

(U) That the contract at page c–1 provided as follows:

"First. The parties hereto mutually agree that the documents attached hereto and herein incorporated and made a part hereof collectively evidencing and constituting the entire Contract to the same extent as if herein written in full, are the Advertisement for Proposals, the accepted Proposal, the Specifications, the Plans, this Agreement, the Contract Bond and all Addenda to the contract documents duly issued and herewith enumerated:"

That defendant never, prior to the time of the contract furnished plaintiff with a map of the project, or other information respecting the availability of particular borrow pits; that the documents which the parties by mutual agreement declare to constitute their entire contract do not contain any such maps or other representations of the availability of particular borrow pits for use upon the project, and that the contract may not lawfully be added to or varied by an alleged agreement by the defendant to make particular borrow pits available.

(V) That the work to be performed by plaintiff under the contract included the borrow work as "Item 7—Borrow" and the clearing work as "Item 7c—Stripping Pits" to be done at unit prices

per cubic yard and per acre respectively in accordance with plaintiff's proposal; that the contract also made provision for additional payments to plaintiff for overhaul which, by the contract, consisted of transporting borrow for greater distances than certain minimum distances, and that such unit prices were by the contract made the sole compensation to which plaintiff was entitled for said items.

(W) That the contract provided that before submitting a proposal, plaintiff should carefully have examined and become familiar with the plans, specifications and other contract documents forming parts of the entire contract; that none of such documents contained any representation that any particular borrow pits were or would be available; that despite details in the specifications and plans as to the duties of both parties and of the engineer, the contract, while requiring defendant to provide materials in borrow pits to plaintiff at no cost, did not impose any obligation upon defendant to provide particular pits; that the contract further provided that plaintiff agreed to ascertain for itself all facts concerning any and all matters which could in any wise affect the contract work, and that any estimates of quantities were in no wise warranties of the true quantities or distribution of quantities; that the contract negatived any alleged representation that particular borrow pits were available or would have suitable material in proper quantity for the prosecution of the contract work, and limited plaintiff to the ascertainment of all such facts for itself.

(X) That if defendant represented to plaintiff the availability of certain particular borrow pits, and plaintiff was required to work different borrow pits, which defendant denies, such work upon different borrow pits, if not within the item of work included in the "Schedule of Prices" and compensable at the prescribed unit prices, was extra work subject to provisions of the contract with

respect to that subject already mentioned.

Concluding Count 5, plaintiff prays judgment upon that count in the sum of $112,734.30 for additional haul, and $15,554.06 for clearing, liability for which sums, or any part thereof, defendant wholly denies.

On the day of, and, it would appear, concurrently with, the filing of the answer, defendant filed the motion for summary judgment under consideration, and with it two supporting affidavits, one sworn to by William B. Getchell, Jr., its executive director, the other by James P. Exum, a partner in the firm designated in the contract as engineer. The unusual punctuality of the tender of the motion may perhaps explain the absence from the record of any preliminary motions or other pleadings, especially any in behalf of plaintiff, and of the usual discovery proceedings. Time and opportunity for them were hardly allowed.

The motion prays for:

"a summary judgment in the defendant's favor, dismissing with costs each and every claim alleged in the complaint (except giving judgment to the plaintiff in the amount of $89,000, provided the plaintiff shall first have satisfied the conditions precedent to such payment by defendant specified in said contract referred to in the complaint and the answer)."

It is based, by its own definition, upon the answer and the affidavits of Getchell and Exum. And its asserted ground is the want of any genuine issue as to any material fact and defendant's claimed right to such judgment as a matter of law. In passing, but with no discussion, notice is taken of the minor disparity of $215.74 between the amounts severally conceded to be due to plaintiff, first in the answer, and secondly in the motion.

The affidavits of Getchell and Exum are of significance only in that they disclose the probable availability of evidentiary support for some positions taken by defendant in its answer. In his affidavit Getchell swears that all extra work orders set forth in the Engineer's final estimate except "Item X–31 Blending Porous Borrow Material" were approved by defendant and accepted by plaintiff; that no extra work order for "Item X–31" was ever approved by defendant, or, so far as he knows, accepted by plaintiff; and that the plans forming part of the contract contained no map or other representation of the availability of borrow pits. And it includes a highly argumentative contention that any erroneous underestimation of the amount of work performed by plaintiff would have resulted in a diminution of the engineer's fee because the fee was a fixed percentage of the total construction cost. In his affidavit, Exum states that in behalf of the designated engineer he was actually in charge of the engineer's work incident to the contract, and in that capacity supervised the preparation of the final estimate; that "Item 7 Borrow" in such estimate was based on actual measurements and surveys, and records kept and was computed according to the contract; that no part of the estimate was false or untrue or made arbitrarily or in bad faith or in misconstruction of the contract, except "Item X–31" which was erroneously included since no extra work order for it was ever approved by defendant; that all extra work orders under the contract were made under his direction and supervision; that, except Item X–31, all work orders set out in the final estimate were approved by defendant and accepted by plaintiff; that no extra work order for Item X–31 was ever approved by defendant or accepted by plaintiff; and that on that account it was error to include Item X–31 in the final estimate.

Plaintiff filed three affidavits in opposition to the motion, one by Alvin D. Pottle, plaintiff's "chief of party" in the performance of the contract, one by Arthur S. Cipolla, plaintiff's chief engineer, the third by Carleton A. Ranks, plaintiff's superintendent of construction in-

cident to the project. I shall hereafter but only briefly revert to these affidavits.

Both upon oral argument, and in their exhaustive and competent written briefs, in the course of the submission of the motion, counsel for the several parties have exhibited a thorough awareness of the reach of Rule 56. And, despite a perceptible variety in emphasis, an understanding of it fairly common to them emerges from their discussion of the provisions of the rule, and the tests for the allowance or denial of relief under it.

 Rule 56 provides machinery whereby in appropriate circumstances, though on fairly rare occasions, disposition may be made without trial of actions in which there is no real factual controversy about any material matter, and one party has a clear legal right to judgment. But, it may not be too positively insisted, it is not a facile device for the elimination from congested calendars of complex cases that threaten to consume a great deal of trial time. Nor is it an instrument through resort to which, a judge whose practical experience as a trial lawyer persuades him that a suit will surely—or almost surely— turn out in a certain way, may bring it quickly and inexpensively to such an end. An unflattering number of opinions of appellate courts may be assembled in support of the impression that trial judges all too frequently forget those cautions, or, for one or another reason, entertain a devotion to Rule 56 which betrays them into an extravagant magnification of its virtue. In truth, it is to be administered only within a narrow and well marked area.

Rule 56 itself provides pretty clearly the basis for the granting of motions tendered under it. After allowing in its subsection (b) the tender of such a motion by a party against whom a claim is asserted, it directs in subsection (c) that:

> "the judgment sought shall be rendered forthwith if the pleadings, depositions and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

It necessarily follows that if it be not so shown, the motion should be denied; and the pertinent decisions so declare. (Vide infra.)

 And judicial opinions applying the rule have, with consistent fidelity to its language, insisted upon strict compliance with its test as the exclusive ground for the granting of a motion under it. It is settled that a summary judgment in an action may be entered if, but only if, the pleadings, depositions, and admissions on file, show that there is no genuine issue as to any material fact and that the moving party is entitled to the judgment he seeks as a matter of law. Such a judgment should never be entered for a defendant on his motion, unless he be entitled to it beyond all doubt. To warrant its entry, the facts alleged or admitted by the plaintiff, or demonstrated beyond reasonable question to exist, should disclose defendant's right to a judgment with such clarity as to leave no room for controversy, and they should affirmatively show that plaintiff would not be entitled to recover under any discernible circumstances. Being an extreme remedy, a summary judgment should be awarded only if and when the truth is quite clear. And all reasonable doubt touching the existence of a genuine issue as to a material fact must be resolved against a party who has moved for summary judgment. It should be noted that the issue whose presence will require the denial of a summary judgment must be a *genuine*, not an ostensible or a sham issue; and that the fact so in issue must be a *material*, not an inconsequential or a trivial fact. In considering a motion within the cited rule, a judge must be mindful of the emphasis on the two italicized words of the foregoing sentence.

The rules thus collected into the foregoing paragraph are supported by authority from the highest source. Elgin, Joliet & Eastern Railway Company v. Burley, 325 U.S. 711, 65 S.Ct. 1282, 89 L.Ed. 1886; 327 U.S. 661, 66 S.Ct. 721, 90 L.Ed. 928; Arenas v. United States, 322 U.S. 419, 64 S.Ct. 1090, 88 L.Ed. 1363; Sartor v. Arkansas Natural Gas Corporation, 321 U.S. 620, 64 S.Ct. 724, 88 L.Ed. 967. It has the sanction of the Court of Appeals, First Circuit. Peckham v. Ronrico Corporation, 1 Cir., 171 F.2d 653; Landy v. Silverman, 1 Cir., 189 F.2d 80. It is abundantly fortified by authority from my own circuit. Ramsouer v. Midland Valley Railroad Company, 8 Cir., 135 F.2d 101; Walling v. Fairmont Creamery Company, 8 Cir., 139 F.2d 318; Sprague v. Vogt, 8 Cir., 150 F.2d 795; Traylor v. Black, Sivalls & Bryson, Inc., 8 Cir., 189 F.2d 213; Dulansky v. Iowa-Illinois Gas & Electric Company, 8 Cir., 191 F.2d 881; Ford v. Luria Steel & Trading Corporation, 8 Cir., 192 F.2d 880, and from other circuits, of whose many opinions considerations of brevity forbid the citation of more than a very few. Doehler Metal Furniture Company v. United States, 2 Cir., 149 F.2d 130; Arnstein v. Porter, 2 Cir., 154 F.2d 464; Bozant v. Bank of New York, 2 Cir., 156 F.2d 787; Sarnoff v. Ciaglia, 3 Cir., 165 F.2d 167; Toebelman v. Missouri-Kansas Pipe Line Company, 3 Cir., 130 F.2d 1016; Stevens v. Howard D. Johnson Company, 4 Cir., 181 F.2d 390; Whitaker v. Coleman, 5 Cir., 115 F.2d 305.

I am quite aware of a number of reported opinions in which it has been held that a case presents an appropriate setting for the entry of a summary judgment in behalf of a moving party, if the want in it of genuine issues of material fact be demonstrated and only legal issues remain for determination. Among them are declarations that a judge may not properly decline to grant a summary judgment if, in the absence of a factual controversy, the law so requires, solely because the legal question involved is difficult to answer. Yet, it is also true that a summary judgment should not be granted if the legal theory supporting it be dubious or tenuous, or if the applicable law be so interwoven with factual shadings that, to its confident analysis, an inquiry into the facts is desirable, though obtainable only by trial. In Stevens v. Howard D. Johnson Company, supra, the late Chief Judge Parker, with characteristic clarity and a measure of present pertinence, wrote thus in reversing and remanding a case in which a summary judgment had been entered by the trial court [181 F.2d 393]:

"A number of questions arise, not only in connection with the breach of the contract, but also in connection with its proper interpretation and the damages recoverable for breach. These, however, should be decided in the light of the evidence which may be adduced upon a trial, not upon the affidavits presented on a motion to dismiss. It must not be forgotten that, in actions at law, trial by jury of disputed questions of fact is guaranteed by the Constitution, and that even questions of law arising in a case involving questions of fact can be more satisfactorily decided when the facts are fully before the court than is possible upon pleadings and affidavits. The motion for summary judgment, authorized by rule 56 Federal Rules of Civil Procedure, 28 U.S.C.A., which in effect legalizes the 'speaking' demurrer, has an important place in providing a prompt disposition of cases which have no possible merit and in preventing undue delays in the trial of actions to which there is no real defense; but it should be granted only where it is perfectly clear that no issue of fact is involved and inquiry into the facts is not desirable to clarify the application of the law. See Westinghouse Electric Corp. v. Bulldog Electric Products Co., 4 Cir., 179 F.2d 139; Wexler v.

Maryland State Fair, 4 Cir., 164 F. 2d 477. And this is true even where there is no dispute as to the evidentiary facts in the case but only as to the conclusions to be drawn therefrom. Paul E. Hawkinson Co. v. Dennis, 5 Cir., 166 F.2d 61; Detsch & Co. v. American Products Co., 9 Cir., 152 F.2d 473; Furton v. City of Menasha, 7 Cir., 149 F.2d 945; Shea v. Second Nat. Bank, 76 U.S.App.D.C. 406, 133 F.2d 17, 22. As was said by Mr. Justice Jackson, speaking for the Supreme Court, in Sartor v. Arkansas Natural Gas Corp., 321 U.S. 620, 627, 64 S.Ct. 724, 728, 88 L.Ed. 967: 'Rule 56 authorizes summary judgment only where the moving party is entitled to judgment as a matter of law, where it is quite clear what the truth is, that no genuine issue remains for trial, and that the purpose of the rule is not to cut litigants off from their right of trial by jury if they really have issues to try.' "

See also Stuart Investment Company v. Westinghouse Electric Corporation, D.C. Neb., 11 F.R.D. 277; Silvray Lighting, Inc. v. Versen, D.C.N.J., 10 F.R.D. 507; Snyder v. Dravo Corporation, D.C.Pa., 6 F.R.D. 546; Bakery and Confectionery Workers' International Union Local No. 492 v. National Biscuit Company, D.C. Pa., 78 F.Supp. 517.

 Especially in an action in which, as here, the motion for summary judgment is by the defendant tendered with, and immediately on the service and filing of, its answer, the court should proceed with caution in the allowance of a motion for a summary judgment. In such a situation, the motion is frequently indistinguishable, in part at least, from a motion under Rule 12(b) (6) to dismiss the complaint for "failure to state a claim upon which relief can be granted." That is true in the present submission. The sufficiency for that purpose of each count is separately drawn in question in the answer; and, in funda- mental substance, it lies at the heart of the motion for summary judgment which insists that as a matter of law the facts averred by plaintiff, even if true, would not support a judgment in its behalf. To the extent only that the motion is thus oriented, it may hardly escape appraisal by the test imposed upon a motion to dismiss for failure to state a claim supporting the allowance of relief. And such a motion must be denied and overruled "unless it appears to a certainty that the plaintiff will be entitled to no relief under any state of facts which may be proved in support of the claim asserted by him in his complaint construed liberally and in the light most favorable to the plaintiff with all doubts resolved in his favor. Musteen v. Johnson, 8 Cir., 133 F.2d 106; Cool v. International Shoe Company, 8 Cir., 142 F.2d 318; Leimer v. State Mutual Life Assurance Company, 8 Cir., 108 F.2d 302; Sparks v. England, 8 Cir., 113 F.2d 579; Publicity Building Realty Corporation v. Hannegan, 8 Cir., 139 F.2d 583; United States v. Arkansas Power & Light Company, 8 Cir., 165 F.2d 354." Stuart Investment Company v. Westinghouse Electric Corporation, supra [11 F.R.D. 280].

 The affidavits that are before the court are only narrowly and doubtfully, if at all, instructive upon the precise issue which is before the court upon the present motion. Affidavits supportive of, or in resistance to, a motion for summary judgment are helpful if and to the extent that they serve to establish either the existence or the absence, as the case may be, of a genuine issue of material fact. Once such an issue emerges or is disclosed, it may not be tried upon a motion for summary judgment by means of an "affidavit match." And the present affidavits serve principally to direct attention to the existence of factual issues by attempting to offer evidence upon them. I am unwilling to determine those issues upon the basis of the affidavits.

 In its prime brief in support of its motion, defendant appears to grant

and concede that its motion for summary judgment is not well taken as against what it characterizes as claim No. 1 of Count 1 of plaintiff's complaint. That so called claim has to do with "Item No. 7, Borrow." While it insists that upon the trial it will establish the invalidity of that claim, it grants that the record now before the court discloses the existence of a genuine factual dispute concerning it. That concession is well considered and is accepted.

But, from the probably prolix statement of issues with which this memorandum is introduced, it inescapably appears that in respect of the remainder of Count 1, and of all of the other counts of the complaint, the pleadings present, and there still persist, genuine issues of fact. In the light of the ruling presently announced, I consider that it would be altogether inappropriate for me to select, assemble and set out the several points on which I consider such issues to exist. They will remain for trial before this court. In the circumstances of my status and assignment, and in view of the remoteness of my official station from Portland, it is highly improbable that I shall try the action on its final merits. I should not, therefore, presume to define—and thereby perhaps inadequately and inaccurately to limit—the factual issues that shall be tried. Even if I were calculated to preside over the trial, I should hesitate to do that. In the first instance, and reserving submission to a judge of the actuality of contentions whose status is in dispute, the selection and definition for trial of the issues in complex litigation is both the task and prerogative of counsel. And each party in this action is represented by conspicuously able counsel. Let them, first by pretrial discovery and procedure, mark out, and, thereafter by trial present, the factual issues upon which they are in real disagreement. With the record thus made, and the evidence and any stipulations or other agreements that may be reached by conference, the trial court will be enabled to arrive at a final factual conclusion and, that done, to stand upon a sure-footed legal basis.

I have kept clearly in view the frequently asserted and reiterated position of defendant that, regardless of the eventual factual determination, plaintiff, as a matter of law, and by virtue of certain cited provisions of the contract may not possibly recover on any count in the complaint, except to the limited extent that liability for an unpaid balance under Count 1 is conceded, and is excepted from the motion as filed. In this setting, from considerations already advanced, I find myself unable to agree with that contention. As a matter of rational judicial administration, with many primary facts in dispute, I consider that appropriate pretrial proceedings should be pursued, trial had in the usual way, the facts, both agreed and determined, found and declared in orderly fashion, the law applicable to those facts—and not as well to many claimed but nonexistent others—announced, and the proper judgment thereupon entered. The judgment should be responsive to the facts as agreed or found to exist, or both.

There is, in this instance, a final, and not inconsiderable, reason for the position I am announcing. This motion for summary judgment is based, so far as the pleadings extend, upon the complaint and the answer. There is neither any reply, nor as I think, any reason or justification for filing one. Under Rule 8(d) averments in a pleading to which no responsive pleading is required or permitted are taken to be, and considered as, denied or avoided by the opposing party. Thus, no reply is necessary, in order for the court to consider in like manner and with like effect as if they had been pleaded, any matters which may appropriately support a denial or a plea in avoidance of any affirmative defensive matter tendered in the answer. So long as the right to support any such denial or avoidance by evidence persists, and it still does, the defense thus vulnerable has to be appraised in that light.

Gulf Refining Company v. Fetschan, 6 Cir., 130 F.2d 129; Traylor v. Black, Sivalls & Bryson, Inc., supra; Jordan v. Hartford Accident & Indemnity Company, D.C.Mo., 77 F.Supp. 817; Lopata v. Handler, D.C.Okl., 37 F.Supp. 871; Cramer v. Aluminum Cooking Utensil Company, D.C.Pa., 1 F.R.D. 741. And the allowability of denial or avoidance is to be regarded in a judge's appraisal of a motion for summary judgment.

It undoubtedly need not be observed that the course here resolved upon is the one designed to bring the case to the earliest final ruling. Ordinarily, the mandate on appeal after a full trial and judicial determination of an action, whether affirmance or reversal occur, is finally dispositive of the litigation. It is not so with reversals of improvidently entered summary judgments. They merely return cases for the trials they ought in the first instance to have undergone, and generally with enhanced expense, to say nothing of delay.

An order is, therefore, being made and given denying and overruling the motion for summary judgment.